# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued May 5, 2006             Decided June 9, 2006

No. 05-1404

AMERICAN COUNCIL ON EDUCATION,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

VERIZON TELEPHONE COMPANIES AND
CELLCO PARTNERSHIP, *D/B/A* VERIZON WIRELESS,
*D/B/A* VERIZON WIRELESS,
INTERVENORS

---

Consolidated with
05-1408, 05-1438, 05-1451, 05-1453

---

On Petitions for Review of an Order of the
Federal Communications Commission

---

*Matthew A. Brill* argued the cause for petitioners. With him on the briefs were *Maureen E. Mahoney*, *Richard P. Bress*, *Barry J. Blonien*, *James Xavier Dempsey*, *John B. Morris, Jr.*, *Albert Gidari*, *Gerard J. Waldron*, *Andrew J. Schwartzman*,

*Harold J. Feld*, *Jason Oxman*, and *Marc Rotenberg*. *John M. Devaney* entered an appearance.

*Jacob M. Lewis*, Attorney, Federal Communications Commission, argued the cause for respondent. With him on the brief were *Samuel L. Feder*, General Counsel, *John E. Ingle*, Deputy Associate General Counsel, and *Joseph R. Palmore*, Counsel.

*Peter D. Keisler*, Assistant Attorney General, U.S. Department of Justice, *Douglas N. Letter*, Litigation Counsel, and *Scott R. McIntosh*, Attorney, were on the brief for respondent United States.

*Michael E. Glover*, *Karen Zacharia*, *Joshua E. Swift*, *John Scott, Samir C. Jain*, and *Meredith B. Halama* were on the brief for intervenors Verizon and Verizon Wireless in support of respondents.

Before: SENTELLE and BROWN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

Dissenting opinion by *Senior Circuit Judge* EDWARDS.

SENTELLE, *Circuit Judge*: In 2004, several law-enforcement agencies petitioned the Federal Communications Commission ("FCC" or "the Commission") to clarify the scope of the Communications Assistance for Law Enforcement Act, 47 U.S.C. §§ 1001-1010 ("CALEA" or "the Act"), with respect to certain broadband Internet services. In response, the Commission ruled that providers of broadband Internet access and voice over Internet protocol ("VoIP") services are regulable as "telecommunications carriers" under the Act. As

"telecommunications carriers," broadband and VoIP providers must ensure that law-enforcement officers are able to intercept communications transmitted over the providers' networks. The American Council on Education and various other interested parties (collectively "ACE") petition for review, arguing that the Commission's interpretation of CALEA was unlawful. Because we disagree, we deny the petition.

I

Before the dawn of the digital era, there were few technological obstacles to the government's wiretapping capabilities: Eavesdropping on a phone call was as easy as finding the copper wires that ran into every caller's home. With the advent of the digital age, however, the architecture of the world's communications networks changed drastically. In the place of physical copper wires that connected individual end-users, new communications technologies (such as digital subscriber line ("DSL"), cable modems, and VoIP)[1] substituted ethereal and encrypted digital signals that were much harder to intercept and decode using old-fashioned call-interception techniques.

Responding to these changing technologies, in 1994 Congress passed CALEA, which requires "telecommunications carriers" to "ensure" that their networks are technologically "capable" of being accessed by authorized law enforcement

---

[1] Throughout this opinion we refer collectively to DSL and cable modems as "broadband Internet access services," or simply "broadband." We refer to interconnected VoIP services—which allow users to make phone calls over broadband connections—simply as "VoIP." *See generally In re IP-Enabled Services*, 19 F.C.C.R. 4863 (2004) (providing background information on both broadband and VoIP).

4

officials.[2] 47 U.S.C. § 1002(a). While CALEA's substantive provisions apply to "telecommunications carrier[s]," they do not apply to "information services." *See id.* § 1002(a), (b). Determining which communications services fall where is the crux of this case.

A

CALEA applies only to "telecommunications carriers." *See id.* § 1002(a). The Act defines a "telecommunications carrier" as an "entity engaged in the transmission or switching of wire or electronic communications as a common carrier for hire." *Id*. § 1001(8)(A). However, in addition to providers of "transmission or switching," CALEA's definition of a "telecommunications carrier" also includes:

> [1] a person or entity engaged in providing wire or electronic communication switching or transmission service to the extent that [2] *the Commission finds that such service is a replacement for a substantial portion of the local telephone exchange service* and that [3] it is in the public interest to deem such a person or entity to be a telecommunications carrier for purposes of this subchapter . . . .

*Id*. § 1001(8)(B)(ii) (emphasis added). Section 1001(8)(B)(ii)—which is commonly referenced as CALEA's "Substantial Replacement Provision" or "SRP"—allows the

---

[2] CALEA does *not* affect the scope of the government's wiretapping powers. Those powers instead come from the Omnibus Crime Control and Safe Streets Act, Pub. L. No. 90-351, 82 Stat. 197 (1968) (codified as amended in scattered sections of 5, 18, and 42 U.S.C.), and the Foreign Intelligence Surveillance Act, Pub. L. No. 95-511, 92 Stat. 1783 (1978), 50 U.S.C. §§ 1801-1871.

Commission to expand the definition of a "telecommunications carrier" to include new technologies that substantially replace the functions of an old-fashioned telephone network.

CALEA does not apply to "persons or entities insofar as they are engaged in providing information services." *Id.* § 1001(8)(C)(i) (the "information-services exclusion"). The Act defines an "information service" as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications." *Id.* § 1001(6)(A). Because information-service providers are not subject to CALEA, they need not make their networks accessible to law-enforcement agencies. *See id.* § 1002(b)(2)(A).

B

In 2004, the United States Department of Justice, the Federal Bureau of Investigation, and the United States Drug Enforcement Administration (collectively, "the DOJ") filed a joint petition for expedited rulemaking before the FCC. The DOJ explained that "[t]he ability of federal, state, and local law enforcement to carry out critical electronic surveillance is being compromised today by providers who have failed to implement CALEA-compliant intercept capabilities." In response, the Commission issued a notice of proposed rulemaking and invited comments on whether certain communications providers—including broadband and VoIP providers—must comply with CALEA. *See Communications Assistance for Law Enforcement Act and Broadband Access and Services*, Notice of Proposed Rulemaking and Declaratory Ruling, 19 F.C.C.R. 15676, 15677 (2004).

After receiving thousands of pages of comments from more than 40 interested parties, the Commission ruled that

broadband and VoIP providers are covered (at least in part) by CALEA's definition of "telecommunications carriers." *See Communications Assistance for Law Enforcement and Broadband Access and Services*, 20 F.C.C.R. 14989, ¶ 8 (2005) ("*Order*"). To avoid an "irreconcilable tension" between CALEA's SRP and the information-services exclusion, the Commission concluded that the Act creates three categories of communications services: pure telecommunications (which plainly fall within CALEA), pure information (which plainly fall outside CALEA), and hybrid telecommunications-information services (which are only partially governed by CALEA). *Id.* ¶ 18.

The FCC then concluded that broadband and VoIP are hybrid services that contain both "telecommunications" and "information" components.[3] *Id.* at ¶¶ 24-45. The Commission explained that CALEA applies to providers of those hybrid services only to the extent they qualify as "telecommunications carriers" under the three prongs of the SRP. First, providers of both technologies must perform switching and transport functions. *See id.* ¶ 26; *id.* ¶ 41. Second, providers of both technologies serve as replacements for a substantial functionality of local telephone exchange service: Broadband replaces the transmission function previously used to reach dial-up Internet service providers ("ISPs"), and VoIP replaces traditional telephone service's voice capabilities. *See id.* ¶¶ 27-31; *id.* ¶ 42. Third, the public interest requires application of CALEA to the "telecommunications" component of both technologies: The even-handed application of CALEA across

---

[3] Our dissenting colleague asserts that "[b]roadband Internet is an 'information service'—indeed, the Commission does not dispute this." Dissent at 2. However, in the *Order* the Commission determines that broadband Internet is not an "information service" for purposes of CALEA. *See Order*, 20 F.C.C.R. 14989, ¶¶ 37-38.

technologies will not impede competition or innovation (*id.* ¶¶ 33-34; *id.* ¶ 43), and "[t]he overwhelming importance of CALEA's assistance capability requirements to law enforcement efforts to safeguard homeland security and combat crime weighs heavily in favor" of applying CALEA broadly. *Id.* ¶ 35; *see also id.* ¶ 44.

Notwithstanding CALEA's breadth, the Commission clarified that the Act does not apply to "private networks." *See id.* ¶ 36 n.100 (citing 47 U.S.C. § 1002(b)(2)(B)). The FCC noted that some broadband companies "provide access to private education, library and research networks." *Id.* The Commission explained that these companies may or may not qualify for CALEA's private-networks exclusion:

> To the extent [the petitioners] are engaged in the provision of facilities-based private broadband networks or intranets that enable members to communicate with one another and/or retrieve information from shared data libraries not available to the general public, these networks appear to be private networks for purposes of CALEA. . . . We therefore make clear that providers of these networks are not included as "telecommunications carriers" under the SRP with respect to these networks. To the extent, however, that these private networks are interconnected with a public network, either the [public voice network] or the Internet, providers of the facilities that support the connection of the private network to a public network are subject to CALEA under the SRP.

*Id.* Thus, private networks—like broadband and VoIP—are excluded from CALEA insofar as they meet one of the statute's exclusions. *See* 47 U.S.C. § 1002(b)(2)(A) (excluding "information services"), (B) (excluding "private networks"). However, to the extent a service provider qualifies as a

"telecommunications carrier," it is subject to CALEA's substantive requirements. *See id.* § 1001(8).

The Commission recognized that it had separately adopted a different interpretation of a similar term ("telecommunications *service*") under a different statute. Interpreting the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, 47 U.S.C. §§ 251-276 ("the Telecom Act" or "the 1996 Act"), the FCC previously concluded that broadband Internet service is *not* a "telecommunications service," and it therefore falls outside the ambit of the 1996 Act. *See In re Inquiry Concerning High-Speed Access to the Internet over Cable and Other Facilities*, 17 F.C.C.R. 4798, 4823 (2002) ("*Broadband Declaratory Ruling*"). To reconcile the *Order* (promulgated under CALEA) with the *Broadband Declaratory Ruling* (promulgated under the 1996 Act), the Commission emphasized that both CALEA and the Telecom Act are silent regarding how (or whether) the FCC should regulate mixed services that have both "telecommunications" and "information" components. *Order*, 20 F.C.C.R. 14989 ¶ 17. Thus, the FCC concluded that both statutes vest it with discretion to interpret Congress's ambiguous treatment of hybrid telecommunications-information services.

In the context of the 1996 Act, the Commission concluded that hybrid services fall entirely outside the statute's scope. Because the 1996 Act defines both "telecommunications service" and "information service" in terms of an "offering" to consumers, *see Broadband Declaratory Ruling*, 17 F.C.C.R. at 4820, ¶ 34, and because consumers perceive broadband Internet access to be a single "offer" for an integrated "information service," *id.* at 4821-24, ¶¶ 35-41, the FCC concluded that cable-modem service is exclusively an "information service," which is unregulable under the 1996 Act, *id.* at 4832, ¶ 59. The Commission further emphasized that its interpretation of the

Telecom Act is consistent with Congress's deregulatory goals. *See id.* at 4802, ¶ 5; *id.* at 4823-24, ¶¶ 40-41; *see also Verizon Commc'ns Inc. v. FCC*, 535 U.S. 467, 502 n.20 (2002) (emphasizing "the deregulatory and competitive purposes of the [1996] Act"); *Cellco P'ship v. FCC*, 357 F.3d 88, 96-103 (D.C. Cir. 2004) (emphasizing the 1996 Act's "deregulatory purpose"). The Supreme Court upheld the FCC's *Broadband Declaratory Ruling* as a "reasonable" interpretation of the 1996 Act. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 125 S. Ct. 2688, 2708 (2005) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 845 (1984)); *see also id.* at 2711 (upholding the Commission's conclusion that the purpose of the 1996 Act is to foster "a minimal regulatory environment that promotes investment and innovation in a competitive market" (internal quotation marks and citation omitted)).

However, the Telecom Act differs significantly from CALEA. Unlike CALEA, the 1996 Act does *not* contain an analogue to CALEA's SRP: While an entity is covered by CALEA if it provides transmission, switching, or the functional equivalent thereof, an entity is covered by the Telecom Act only if it provides "transmission." *See* 47 U.S.C. § 153(43). Also unlike CALEA, the Telecom Act does *not* contain an analogue to CALEA's "insofar as" clause: While an entity is excluded from CALEA only "insofar as" it provides "information services," the 1996 Act categorically excludes "information services" *en toto*. *See id.* § 153(44). Finally, unlike CALEA, the Telecom Act refers to *two* "service offerings": While CALEA refers only to an "offering" of "information services," the Telecom Act refers to "offerings" of both "telecommunications services" and "information services." *Id.* § 153(20), (46); *see also Broadband Declaratory Ruling*, 17 F.C.C.R. at 4823, ¶ 40 (emphasizing the fact that the 1996 Act—unlike CALEA—contains separate definitions for

"telecommunications" and "telecommunications service").

Drawing on the statutes' different texts, structures, legislative histories, and purposes, the FCC decided to resolve the ambiguities in CALEA and the 1996 Act differently. In light of "Congress's deliberate extension of CALEA's [substantive] requirements to providers satisfying the SRP," the FCC concluded that a telecommunications carrier should *not* escape the Act's reach altogether simply because the carrier's service offering has an "informational" component. *Order*, 20 F.C.C.R. 14989, ¶ 18. Thus, the FCC concluded that CALEA's definitional sections are *not* mutually exclusive: "[W]hen a single service comprises an information service component and a telecommunications component, Congress intended CALEA to apply to the telecommunications component." *Id.* at ¶ 21. The Commission further emphasized that its interpretation of CALEA is consistent with the Act's law-enforcement goals. *Id.*; *cf. Verizon*, 535 U.S. at 502 n.20.

II

ACE raises three arguments in its petition for review. First, ACE argues that broadband Internet access is an integrated "information service" under CALEA, and as such, it is uniformly excluded from the Act's substantive requirements. Second, ACE argues that VoIP similarly qualifies for CALEA's information-services exclusion. Third, ACE argues that the Commission unlawfully applied the Act to "private networks."

Our review is governed by the classic two-step approach set out in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See U. S. Telecom Ass'n v. FCC*, 227 F.3d 450, 457 (D.C. Cir. 2000). Under *Chevron*, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously

expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. However, if the statute is "silent or ambiguous with respect to the specific question at issue," we ask whether the agency's interpretation is "permissible," that is, "reasonable." *Id.* at 843-44; *see also Northpoint Tech., Ltd. v. FCC*, 412 F.3d 145, 151 (D.C. Cir. 2005) ("A 'reasonable' explanation of how an agency's interpretation serves the statute's objectives is the stuff of which a 'permissible' construction is made; an explanation that is 'arbitrary, capricious, or manifestly contrary to the statute,' however, is not." (citations omitted)).

A

ACE first argues that broadband Internet access is an "information service," which falls completely beyond CALEA's reach. The Supreme Court has upheld the FCC's classification of broadband as an integrated "information service" under the Telecom Act. *See Brand X*, 125 S. Ct. at 2696. CALEA's definition of "information service" is virtually identical to the one included in the 1996 Act. *Compare* 47 U.S.C. § 1001(6) (CALEA), *with id.* § 153(20) (Telecom Act). Therefore, ACE concludes broadband providers must fall within the ambit of CALEA's identical "information services" exclusion. Notwithstanding the superficial attractiveness of ACE's argument, we disagree.

ACE's syllogism falls apart because CALEA and the Telecom Act are different statutes, and *Brand X* was a different case. Although ACE would have us read *Brand X* as controlling this controversy, that case did *not* hold that broadband Internet access is exclusively an "information service," devoid of any "telecommunications" component. Rather, it upheld the *FCC's* reasonable interpretation to that effect under a *different statute*. *See* 125 S. Ct. at 2708 (citing *Chevron*, 467 U.S. at 845 (step two)). Emphasizing that the Telecom Act "is ambiguous about

whether cable companies 'offer' telecommunications with cable modem service," *id.* at 2706, the Court concluded "that the Commission's construction was a reasonable policy choice for the Commission to make at *Chevron*'s second step," *id.* at 2708 (internal quotation marks, citation, and alteration omitted).

So here. CALEA expressly provides that the Commission may extend the definition of a "telecommunications carrier . . . to the extent that *the Commission finds* that [a] service is a replacement for a substantial portion of the local telephone service and that it is in the public interest to deem such a person or entity to be a telecommunications carrier . . . ." 47 U.S.C. § 1001(8)(B)(ii) (emphasis added). Where, as here, "Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight," so long as they reflect "reasonable policy choice[s]." *Chevron*, 467 U.S. at 843-45; *see also United States v. Mead Corp.*, 533 U.S. 218, 229 (2001).

The Commission's interpretation of CALEA represents a "reasonable policy choice." CALEA—unlike the 1996 Act—is a law-enforcement statute. *See* 47 U.S.C. § 1002(a) (requiring telecommunications carriers to enable "the government" to conduct electronic surveillance); *id.* § 1001(5) (defining "government" as any public entity "authorized by law to conduct electronic surveillance"). The Communications Act (of which the Telecom Act is part), by contrast, was enacted "[f]or the purpose of regulating interstate and foreign commerce in communication by wire and radio . . . ." *Id.* § 151; *see also Verizon*, 535 U.S. at 502 n.20 (emphasizing "the deregulatory and competitive purposes of the [1996] Act"). The statutes' respective texts reflect their disparate objectives: While the 1996 Act is framed in terms of "offerings" made by "service"-

13

providers to consumers, CALEA's SRP empowers the FCC to expand its definition of a "telecommunication carrier" to meet the evolving needs of law enforcement officials. The Commission's interpretation of CALEA reasonably differs from its interpretation of the 1996 Act, given the differences between the two statutes.[4]

Specifically, CALEA differs from the 1996 Act in two important ways. First, CALEA's definition of "telecommunications carrier" is broader than the definition used in the 1996 Act. To highlight the difference, we present the statutory texts synoptically.

---

[4] ACE attempts to obscure the differences between CALEA and the 1996 Act by arguing that "when Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." Pet. Br. at 26 (quoting *Smith v. City of Jackson*, 125 S. Ct. 1536, 1541 (2005) (internal quotation marks omitted)). Of course, ACE is correct—but only when Congress "*uses the same language* in two statutes *having similar purposes*." As illustrated herein, CALEA's language and purpose differ markedly from the 1996 Act.

14

| CALEA | TELECOM ACT OF 1996 |
|---|---|
| The term "telecommunications carrier" (A) means a person or entity engaged in the transmission or switching of wire or electronic communications as a common carrier for hire; and (B) includes . . . (ii) a person or entity engaged in providing wire or electronic communication switching or transmission service to the extent that the Commission finds that such service is a replacement for a substantial portion of the local telephone exchange service and that it is in the public interest to deem such a person or entity to be a telecommunications carrier for purposes of this subchapter; but (C) does not include (i) persons or entities insofar as they are engaged in providing information services . . . . | The term "telecommunications carrier" means any provider of telecommunications services [*i.e.*, the offering of transmission for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used] . . . . |
| 47 U.S.C. § 1001(8) | 47 U.S.C. § 153(43), (44), (46) |

While the Telecom Act limits its definition of "telecommunications services" to "transmission," CALEA's text is more inclusive: CALEA defines a "telecommunications carrier" as a provider of "transmission or switching" *plus* any provider that substantially replaces traditional transmission or

switching. *See id.* § 1001(8)(B)(ii) (SRP).[5]

The second major difference between the two statutes is that CALEA's text and structure suggest that its definitions for "telecommunications carrier" and "information services" are not mutually exclusive terms. Unlike the 1996 Act, CALEA does not refer to a "telecommunications *service,*" nor does its definition of "telecommunications carrier" include a reference to a service "offering." Moreover, CALEA's definition of a "telecommunications carrier"—unlike the 1996 Act's definition of that term—excludes entities only "*insofar as* they are engaged in providing information services." *Id.* § 1001(8)(C)(i) (emphasis added). These distinctions suggest that CALEA does *not* define two mutually exclusive "services" that are independently "offered" to consumers. That is, under CALEA, a carrier might "offer" one "service" that contains both "telecommunications" and "information" components.

ACE's argument to the contrary relies on the fact that "information services," by statutory definition, are delivered "via telecommunications" under both CALEA and the Telecom Act. *See* CALEA § 1001(6)(A) (defining "information services" as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications"); Telecom Act § 153(20) (same). In ACE's view, the "via

---

[5] ACE attempts to cabin the expansive effect of the SRP by arguing that it applies only "to commercial providers of 'telecommunications' that are *not* common carriers for hire." Pet. Br. at 38 (emphasis added and removed). However, ACE's interpretation of the SRP would eviscerate the clause that immediately precedes it, which defines a telecommunications carrier as "a common carrier for hire." 47 U.S.C. § 1001(8)(A). Whatever the SRP's meaning, ACE's internally contradictory interpretation is not it.

telecommunications" clause makes the telecommunications and information components of an informational service offering inseparable under both statutes. That is, once the "telecommunications" dimension of an "information service" is removed, the definition of the latter term becomes a nullity. As a result, ACE argues, we should interpret CALEA to create two mutually exclusive categories of "telecommunications" and "information" services, which can never overlap.

ACE's analysis is inconsistent with our standard of review. We cannot set aside the Commission's reasonable interpretation of the Act in favor of an alternatively plausible (or an even better) one. *See*, *e.g.*, *Brand X*, 125 S. Ct. at 2699 ("If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation."); *Citizens Coal Council v. Norton*, 330 F.3d 478, 482 (D.C. Cir. 2003) ("Even assuming the correctness of [an alternative interpretation], the ambiguity of the statute in combination with the *Chevron* doctrine eclipses the ability of the courts to substitute their preferred interpretation for an agency's reasonable interpretation when that agency is the entity authorized to administer the statute in question."); *Nat'l Mining Ass'n v. Babbitt*, 172 F.3d 906, 916 (D.C. Cir. 1999) ("If we were interpreting the statute *de novo*, we might well agree that appellant has the better argument. But we are not. And although the government's reading is a bit of a stretch, we think it passes the *Chevron* test."). The FCC offered a reasonable interpretation of CALEA, and *Chevron*'s second step requires nothing more.

We hasten to emphasize the continued vitality of CALEA's information-services exclusion. As the Commission explained:

A facilities-based broadband Internet access service provider continues to have *no* CALEA obligations with respect to, for example, the storage functions of its e-mail service, its web-hosting and ["Domain Name System," or "DNS"] lookup functions or any other ["Internet Service Provider," or "ISP"] functionality of its Internet access service. It is only the "switching and transmission" component of its service that is subject to CALEA under our finding today.

*Order*, 20 F.C.C.R. 14989, ¶ 38 (emphasis in original and footnote omitted). Because CALEA's definitions for "telecommunications" and "information service" are not mutually exclusive, the Commission reasonably concluded that mixed services—such as broadband Internet access—are partially covered by (and partially excluded from) the statute: The "switching and transmission" portion of a broadband service offering—which replaces the "switching or transmission" portion of a dial-up Internet connection—is covered, while any "capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications," 47 U.S.C. § 1001(6)(A), is not.

The Commission has long distinguished between "information services" and the underlying "telecommunications" that transport them. *See, e.g., Amendment of Section 64.702 of the Commission's Rules & Regulations* (*Second Computer Inquiry*), 77 F.C.C. 2d 384, 475, ¶ 231 (1980); *Universal Service Report*, 13 F.C.C.R. 24012, 24030, ¶ 36 (1998); *CALEA Second Report & Order,* 15 F.C.C.R. 7105, 7120, ¶ 27 (1999); *CPE/Enhanced Services Bundling Order*, 16 F.C.C.R. 7418, 7444, ¶ 43 (2001); *Section 271 Remand Order*, 16 F.C.C.R. 9751, 9770, ¶ 36 (2001); *Wireline Broadband Order*, 20 F.C.C.R. 14853, 14864, ¶ 16

(2005).[6]  The FCC reasonably applied that well-settled distinction to give meaning to both the SRP and the information-services exclusion in the context of broadband providers. Accordingly, we deny the petition for review.

B

ACE next argues that the Commission arbitrarily and capriciously "refused to classify VoIP as either a telecommunications service or an information service." Pet. Br. at 33.  At oral argument, ACE's counsel clarified that it is not challenging the merits of VoIP's classification in one category or the other; ACE argues only that the Commission must classify it.  *See* Tr. of Oral Arg. at 13:14-19:03.  We need not tarry long over this claim.

As we explained above, CALEA says nothing about "telecommunications *service[s]*."  To the extent ACE and its fellow petitioners confusedly petitioned the Commission to

---

[6] Our dissenting colleague argues that "[p]rior to the issuance of the instant Order, the Commission has consistently held that broadband Internet service is an 'information service.'  It has never previously said otherwise.  Indeed, it has never hinted otherwise." Dissent at 6.  However, the Commission has consistently recognized that the telecommunications and information components of broadband are distinguishable.  The fact that the Commission treated those components as an integrated service-offering under one statute does not preclude the Commission from reasonably treating those differentiable components differently under a different statute.  *Cf. Brand X*, 125 S. Ct. at 2699-2700 ("[I]f the agency adequately explains the reasons for a reversal of policy, change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." (internal quotation marks and citation omitted)).

(mis)classify VoIP in relation to a nonexistent statutory term, the FCC did not err by declining the invitation. Moreover, ACE ignores the fact that the Commission *did* classify VoIP providers as "telecommunications *carriers*," *see Order*, 20 F.C.C.R. 14989, ¶¶ 39-44, while specifically excluding the voice-transmission portions of VoIP from the definition of "information services," *see id.* ¶ 45. Regardless of the merits of that classification—which ACE does not challenge—no one can deny that the Commission made it.

C

ACE's third and final argument focuses on a single word in a single sentence in a single footnote from the *Order*. The Commission noted: "To the extent [that] private networks are interconnected with a public network, either the [public voice network] or the Internet, providers of the facilities that *support* the connection of the private network to a public network are subject to CALEA under the SRP." *Order*, 20 F.C.C.R. 14989, ¶ 36 n.100 (emphasis added). Relying on language from the *proposed* rule, ACE insists that the inclusion of the word "support" in the FCC's final rule "provides no real comfort" for its fears that the Commission will extend its regulatory authority "throughout [an] entire private network." Pet. Br. at 46.

Although ACE's argument suggests the point is not necessarily self-evident, it should go without saying that a *proposed* rule is not a *final* rule. It should be equally obvious that a challenge to the Commission's possible future applications or extensions of CALEA does not ripen by virtue of a petitioner's unfounded fears. *See, e.g.*, *Fed. Express Corp. v. Mineta*, 373 F.3d 112, 119 (D.C. Cir. 2004) (holding "if and when [the petitioner's fear] does come to pass, judicial review of the issue 'is likely to stand on a much surer footing in the context of a specific application of this regulation than could be

the case in the framework of the generalized challenge made here.'" (quoting *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967)); *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284-85 (D.C. Cir. 2003) (holding a speculative fear about possible future agency action does not present a case or controversy ripe for review). The *Order* on review—like CALEA—expressly excludes "private networks" from its reach. *See Order*, 20 F.C.C.R. 14989, ¶ 36; 47 U.S.C. § 1002(b)(2)(B). If and when the Commission expands its interpretation, an aggrieved party can bring a petition for review at that time.

## III

For the reasons set forth above, the petition for review is

*Denied*.

EDWARDS, *Senior Circuit Judge, dissenting*:

> **Regardless of how serious the problem an administrative agency seeks to address ... it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law.**
>
> **FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 125 (2000).**

The Communications Assistance for Law Enforcement Act ("CALEA") sets forth "assistance capability requirements," compelling "telecommunications carriers" to build and sustain their equipment in a manner that allows law enforcement agents to execute surveillance orders. Importantly, for purposes of this case, the statute

- explicitly states that "telecommunications carrier[s]" do not include "persons or entities insofar as they are engaged in providing information services," 47 U.S.C. § 1001(8)(C)(i) (2000),

- defines "information services" as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications," *id.* § 1001(6)(A), and

- expressly states that the assistance capability requirements "do not apply to [ ] information services," *id.* § 1002(b)(2)(A).

In determining that broadband Internet providers are subject to CALEA as "telecommunications carriers," and not excluded pursuant to the "information services" exemption, the Commission apparently forgot to read the words of the statute. CALEA does not give the FCC unlimited authority to regulate every telecommunications service that might conceivably be used to assist law enforcement. Quite the contrary. Section 1002 is precise and limited in its scope. It expressly states that

the statute's assistance capability requirements "do not apply to [ ] information services." *Id.* Broadband Internet is an "information service" – indeed, the Commission does not dispute this. Therefore, broadband Internet providers are exempt from the substantive provisions of CALEA.

---

The FCC apparently believes that law enforcement will be better served if broadband Internet providers are subject to CALEA's assistance capability requirements. Although the agency may be correct, it is not congressionally authorized to implement this view. In fact, the "information services" exemption prohibits the FCC from subjecting broadband service providers to CALEA's assistance capability requirements. If the FCC wants the additional authority that Congress withheld, it must lobby for a new statute. Until Congress decides that the "information services" exemption is ill-advised, the agency is bound to respect the legislature's will and we are bound to enforce it. *See Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc) ("Were the courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well.").

What we see in this case is an agency attempting to squeeze authority from a statute that does not give it. The FCC's interpretation completely nullifies the information services exception and manufactures broad new powers out of thin air.

---

The most troubling aspect of the FCC's interpretation of CALEA is that it is directly at odds with the statutory language. The statute defines "information services" as the offering of various information capabilities *via telecommunications*. 47 U.S.C. § 1001(6)(A). *See* Appendix. The offering of one of the

specified information capabilities *"via telecommunications"* is integral to the definition of exempt services. Despite this clear language, the Commission's Order states that "when a single service comprises an information service component and a telecommunications component, Congress intended CALEA to apply to the telecommunications component." *Communications Assistance for Law Enforcement and Broadband Services*, First Report and Order and Notice of Proposed Rulemaking, 20 F.C.C.R. 14,989 ¶ 21 (2005) ("Order"). This is utter gobbledygook, and it certainly cannot be what Congress intended. Under the plain words of the statute, exempt information services are those specified services that include a telecommunications component. If, as the FCC would have it, the telecommunications component is excised, the statutorily defined exemption no longer exists. This makes no sense.

The net effect of the FCC's interpretation is to vitiate the statutory exception altogether. If all information services that are carried out "via telecommunications" are subject to CALEA, then the "information services" exemption is an empty set. Under the plain terms of the statute, this cannot be.

In the face of this reality, the Commission offers an example of a service that, under its interpretation, allegedly falls within the information services exception – the "storage functions of [a broadband Internet access provider's] e-mail service." Order at ¶ 38. The example highlights the absurdity of the agency's position. Once email storage functions are viewed apart from the telecommunications mechanism used to transmit email messages, there is no sense in which email services are offered "via telecommunications." Thus defined, email storage services fall outside of the statutory exception and are thus potentially subject to CALEA's requirements.

_____

If the FCC had construed CALEA's information services exception consistent with the parallel provision in the Communications Act – which is identical in all relevant respects, *compare* 47 U.S.C. § 1001(6) (2000) (CALEA) *with id.* § 153(20) (Communications Act) – the agency would have given full effect to every provision of CALEA. And the FCC could have relied on the statute's "substantial replacement" provision to apply CALEA to services that are not information services and that do not otherwise fit within the definition of telecommunications carrier.

VoIP is an example of such a service. There is no doubt that VoIP replaces a substantial portion of local telephone exchange service – it offers exactly the same functionality as phone service. And, in contrast to broadband service, the Commission has explicitly refrained from designating VoIP as an information service under the Communications Act, *see Federal-State Joint Board on Universal Service*, Report to Congress, 13 F.C.C.R. 11,501, 11,541 ¶ 83 (1998).

―――――――――

It seems that the Commission had little interest in reading CALEA in a manner that is consistent with the statute's language and structure. The Commission's argument is quite revealing. By emphasizing the need to construe CALEA to "ensur[e] that technological change [does] not erode lawful surveillance authority," FCC's Br. at 30, the Commission betrays its true objective: administrative amendment of the statute. Our standard for reviewing an agency's interpretation of congressional commands does not permit us to ratify the FCC's unauthorized attempt to legislate new and better tools for law enforcement.

As *Chevron* and its progeny teach, an "agency's interpretation of the statute is not entitled to deference absent a *delegation of authority* from Congress to regulate in the areas at

issue." *Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 801 (D.C. Cir. 2002). In *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218 (1994), the Court held that the FCC's congressionally authorized ability to modify the § 203 requirements of the Communications Act did not permit the agency to make basic and fundamental changes in the statute's regulatory scheme. In refusing to ratify the Commission's interpretation of the statute, the Court found it "highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion – and even more unlikely that it would achieve that through such a subtle device as permission to 'modify' rate-filing requirements." *Id.* at 231.

The Supreme Court reiterated this view in *Brown & Williamson*. There the Court rejected an attempt by the Food and Drug Administration to regulate tobacco products, noting that "Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion." 529 U.S. at 160. *See also Am. Library Ass'n v. FCC*, 406 F.3d 689 (D.C. Cir. 2005) (an agency does not possess plenary authority to act within a given area simply because Congress has endowed it with *some* authority to act in that area); *Am. Bar Ass'n v. Federal Trade Comm'n*, 430 F.3d 457 (D.C. Cir. 2005) (same).

Similar considerations militate against the proposition that, in enacting CALEA, Congress quietly granted the FCC the authority to subject a new industry – providers of broadband service – to the intrusive requirements of the statute. In gauging the plausibility of the FCC's purported authority, one surely must look to the FCC's treatment of the "information services" exception under the Communications Act. A term in one statute does not necessarily control the Commission's actions under another statute. But here the Commission's earlier rulings show that "information services" has become a term of art. The

agency cannot simply ignore its prior *consistent* constructions of "information services," especially when it offers no coherent alternative interpretation. Under the Commission's current order, "information services" is meaningless.

Prior to the issuance of the instant Order, the Commission has consistently held that broadband Internet service is an "information service." It has never previously said otherwise. Indeed, it has never hinted otherwise. For example, in its Declaratory Ruling on the status of cable modem service under the Communications Act, the Commission held:

> As currently provisioned, cable modem service is a single, integrated service that enables the subscriber to utilize Internet access service through a cable provider's facilities and to realize the benefits of a comprehensive service offering.
>
> . . . Consistent with the statutory definition of information service, cable modem service provides the capabilities described above "via telecommunications." That telecommunications component is not, however, separable from the data-processing capabilities of the service. As provided to the end user the telecommunications is part and parcel of the cable modem service and is integral to its other capabilities.

*Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilitites*, Declaratory Ruling and Notice of Proposed Rulemaking,17 F.C.C.R. 4798, 4823 ¶¶ 38-39 (2002) (internal citations omitted). *See also Appropriate Framework for Broadband Access to the Internet over Wireline Facilities,* Report & Order & Notice of Proposed Rulemaking, CC Docket No. 02-33, FCC 05-150, ¶ 15 (rel. Sept. 23, 2005) ("Because wireline broadband Internet access service inextricably combines the offering of powerful computer capabilities with telecommunications, we conclude that it falls within the class of

services identified in the Act as 'information services.'"); *Federal-State Joint Board on Universal Service*, 13 F.C.C.R. at 11,539 ¶ 80 ("The provision of Internet access service involves data transport elements . . . . But the provision of Internet access service crucially involves information-processing elements as well; it offers end users information-service capabilities inextricably intertwined with data transport. As such, we conclude that it is appropriately classed as an 'information service.'") (internal citations omitted).

There is no doubt that an "initial agency interpretation is not instantly carved in stone"; nor is there any doubt that, if acting pursuant to delegated authority, an agency may adopt different interpretive positions to address different problems. *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 125 S. Ct. 2688, 2700 (2005) (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 863-64 (1984)). But these points are of no moment in this case.

The question here is whether the FCC has identified a statutory predicate for enlarging CALEA's scope to encompass providers of broadband access. It has not. Merely saying that broadband is not an information service does not make it so, certainly not in light of all that the FCC has said in the past. And merely invoking *law enforcement*, "as though it were a talisman under which any agency decision is by definition unimpeachable," *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983), offends good sense.

The FCC can no more contend that "information service" providers are really "telecommunications carriers" because their regulation can facilitate the law enforcement purposes of CALEA, than the agency could assert that those who operate "movie theaters" are really "radio broadcasters" because their regulation would facilitate control of indecent material pursuant to 18 U.S.C. § 1464 (2000). There is absolutely no permissible

basis for this court to sustain the FCC's convoluted attempt to infer broad new powers under CALEA. The agency has simply abandoned the well-understood meaning of "information services" without offering any coherent alternative interpretation in its place. The net result is that the FCC has altogether gutted the "information services" exemption from CALEA. Only Congress can modify the statute in this way.

**The Applicable Provisions of the Communications Assistance for Law Enforcement Act, 47 U.S.C. § 1001 *et seq.***

**47 U.S.C. § 1001.  Definitions.**

\* \* \* \*

(6)    The term **"*information services*"** –

    (A)    means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information ***via telecommunications***; and

    (B) includes –

        (i)    a service that permits a customer to retrieve stored information from, or file information for storage in, information storage facilities;

        (ii)    electronic publishing; and

        (iii)    electronic messaging services;  but

    (C)    does not include any capability for a telecommunications carrier's internal management, control, or operation of its telecommunications network.

\* \* \* \*

(8) The term **"telecommunications carrier"** –

    \* \* \*

    (C) **does not include** –

        (i)    persons or entities insofar as they are engaged in **providing information services**;

\* \* \* \*

**47 U.S.C. § 1002.  Assistance capability requirements.**

(a)    Capability requirements

    . . . a telecommunications carrier shall ensure that its equipment, facilities, or services that provide a customer or subscriber with the ability to originate, terminate, or direct communications are capable of  [serving government needs in intercepting digital and other communications] . . . .

(b)    Limitations

\* \* \* \*

    (2)    Information services; private networks and interconnection services and facilities

    **The requirements of subsection (a) of this section do not apply to** –

    (A)    **information services**;

\* \* \* \*